# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **ROBERT PHAROAH HOWARD,** | ) | |
| Plaintiff | ) | Civil Action No.: 7:12cv00079 |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **L.B. PHIPPS, et al.,** | ) | By: PAMELA MEADE SARGENT |
| Defendants | ) | United States Magistrate Judge |

The pro se plaintiff, Robert Pharoah Howard, is a Virginia Department of Corrections, ("VDOC"), inmate currently housed at Red Onion State Prison, ("ROSP"). In his initial complaint, Howard raised claims against numerous defendants employed at ROSP. The only claim remaining before the court is Howard's § 1983 claim based on a violation of his Eighth Amendment right to be free from cruel and unusual punishment against defendants Sgt. L. B. Phipps, (now known as Sgt. Messer), correctional officers S. Fields, Whisenhunt and Tate and ROSP Warden Randall C. Mathena.[1] This case is before the court on cross motions for summary judgment, (Docket Item Nos. 60, 91, 104, 106). The motions are before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). An evidentiary hearing was held in this matter before the undersigned on August 8, 2013, to allow development of the record before the court. The undersigned now submits the following report and recommended disposition.

---

[1] Howard's other claims were disposed of by opinion and order of the court entered December 14, 2012.

## I. Facts

Howard brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by using excessive force on him or failing to prevent the use of excessive force on him on November 7, 2011. In particular, Howard claims that ROSP correctional officers S. Fields and Whisenhunt injured his left arm that day when they took the security box off of his tray slot door and dug screws located in the top of the box into his left forearm and wrist, causing deep puncture wounds. Howard also claims that Sgt. Messer sprayed him with pepper spray without getting medical clearance to utilize the spray and that the prison staff refused to decontaminate him afterward. Howard claims that, after this incident, Tate placed him back in his cell on modified strip cell status with no water to decontaminate himself.

At the August 8 hearing, Howard testified that, during afternoon pill call at ROSP on November 7, 2011, he put his left arm through the tray slot of his cell door and into the security box to retrieve his medication. He stated that it was necessary to place his whole arm in the box because he had to reach up under the tray slot door to retrieve the cup holding his medication. He stated that Fields used his knee to knock the security box off of the tray slot latch and pressed it down on his left arm. He testified that Whisenhunt and Officer Head, who has since died, helped Fields press the box down on his arm. Howard testified that he asked the officers, "Why are you doing this?" He said Fields responded, "Shut up nigger." Howard said that Fields also said, "Stop minding other people's business."

Howard stated that screws in the top of the box punctured into his left forearm and cut his wrist. He testified that, when the screws punctured his arm, blood squirted out. Howard said that the officers held the box down on his arm for two to three minutes. During this time, Howard stated that his arm bled into the box, and the blood got on his clothing. He testified that Messer came to his cell door and sprayed him with pepper spray before she ordered him to remove his arm from the security box. Howard stated that Messer, at one point, had to jerk her head back because blood from his arm squirted out of the security box. According to Howard, Messer sprayed pepper spray four times causing him to lose his breath and fall to the floor, pulling his left arm out of the box. Howard testified that he is an asthmatic and, when exposed to pepper spray, he loses all his oxygen and starts wheezing when he breathes.

Howard further testified that he was eventually taken from his cell to be decontaminated. He stated that he asked not to be decontaminated with hot water but with cold water. He stated that the officers did not decontaminate him and, instead, placed him back in his cell on a modified strip cell status with no water from approximately 3:30 to 10 p.m. Howard stated that Tate authorized placing him on strip cell status. Howard testified that he was not assessed by anyone from the medical department until approximately 6:45 p.m. when Nurse Holbrook looked at his wounds and applied Neosporin and Band-Aids.

Howard testified that, as a result of the use of pepper spray, he had difficulty breathing and suffered from an asthma attack six days later. He said that he also coughed up blood. He also stated that he sustained eye injuries from the pepper spray. Howard stated that Plaintiff's Exhibits 1 and 2 are photographs taken the following day showing the puncture wounds in his left forearm near his elbow.

Plaintiff's Exhibits 4 and 5 are photographs taken the following day showing the injury to his left wrist area.

Howard testified that his arm injuries healed but left scars. He also stated that he began having trouble with his eyes on January 12, 2013, as a result of the use of the pepper spray. He further stated that he continues to have trouble breathing and is forced to use his inhaler more than before the use of the pepper spray on him. Howard did admit that pepper spray was used on him again on December 29, 2011.

Correctional Officer Sanford Fields testified that he was accompanying Nurse Deel on the afternoon pill pass on November 7, 2011. When they came to Howard's cell, Fields placed the security box on the cell door over the tray slot. Fields stated that the security box used for pill pass weighed no more than 10 pounds. Howard's medication was placed in the box, and Fields released the tray slot door allowing Howard access into the security box to retrieve his medication. Fields testified that Howard started "cussing" and put his whole left arm into the box and came up with his arm and knocked the security box off of the tray slot latch. Fields stated that the security box dropped down on the tray slot and he struggled to hold the box against the door. Fields said that Howard continued to try to knock the box off of the door.

According to Fields, Nurse Deel left the area for her safety, and Officer Whisenhunt came to assist him in holding the box against the cell door. Fields testified that, when Howard attempted to knock the box off of the tray slot, he concluded that Howard was trying to be assaultive. Fields said that he was not present when Howard was eventually removed from his cell.

Sgt. Lori Beth Phipps Messer testified that she was in an adjacent housing unit on November 7, 2011, when she was called to Howard's cell. When she arrived at Howard's cell, she said that the lower half of Howard's left arm was inside the security box, and he was thrusting it upward in an effort to knock the box off of the cell door. Messer said that she ordered Howard numerous times to remove his arm from the security box. When Howard refused to remove his arm, she said that she dispensed a one-half to one second spray of pepper spray, which hit Howard in the lower torso area of his body.

Although she said that medical ultimately approved the use of pepper spray on Howard, Messer admitted that she dispensed the spray prior to receiving medical approval because she believed Howard's actions were posing a danger to staff. Messer stated that she heard Howard say, "I am going to kill you…." Messer stated that she considered Howard to be an assaultive offender based on her experience with him. Messer stated that she was not present when Howard was removed from his cell. She said she had gotten some pepper spray in her face and she had left to wash it.

Janet Deel testified that she was a licensed practical nurse at ROSP and that she was participating in the afternoon pill pass when Howard became disruptive on November 7, 2011. Deel stated that, after she placed Howard's medications in the security box in a paper cup, she saw Howard hitting the security box with his arm, and she moved out of the way of the officers. Deel testified that, based on where she had placed the cup containing his medication, Howard would not have been required to place more than his hand into the box to retrieve the cup. She specifically denied placing the pill cup under the tray slot lid.

Deel also testified that she assessed Howard after he was removed from his cell. Deel stated that she observed a small laceration to Howard's right wrist, to which she applied Neosporin and a Band-Aid. A medical report completed by Deel regarding this treatment was admitted into evidence as part of Defendant's Exhibit 2. Deel stated that, when she assessed Howard, there was no blood on him or on his clothing. When showed Plaintiff's Exhibits 1 and 2, Deel testified that she did not see these injuries on Howard when she assessed him on November 7, 2011. She further stated that, if she had seen any injuries on Howard's left arm, she would have documented those on her report.

Capt. Delmar Tate testified that he also came into contact with Howard after the use of pepper spray when Howard was placed back into his cell on strip cell status as a result of a threat to stab an officer. Tate said that he authorized placing Howard on strip cell status because he had been told that Howard made a threat to stab an officer. Tate stated that he saw no puncture wounds in Howard's arm and no blood on Howard or his clothing. Based on Howard's threat, Tate said that Howard's cell was searched and decontaminated before Howard was returned to the cell. Tate said that he recalled that water was standing about an inch deep in Howard's cell when he was removed from the cell.

Tate testified that, at that time, the security boxes ROSP used had one open side that was placed against the cell door covering the tray slot. He said the box would sit on a "hasp" or latch that kept the tray slot closed. Once the box was in place, the latch would be released allowing the tray slot door to open 90 degrees so that it would rest parallel to the bottom of the security box. Tate stated that the

tray slot would be closed by lifting up on the security box. Tate stated that the tray slot in the cell door was 16 inches wide, 5 inches high and 2 inches deep.

Lt. Paul Payne testified that he assisted in removing Howard from his cell on November 7, 2011, after the use of pepper spray. Payne stated that Howard originally told him that he wished to be removed from his cell to be decontaminated, but then he refused to present himself at his cell door to be restrained. Payne said that Howard eventually did present himself to be restrained and was removed from the cell. Payne stated that a spit mask was placed on Howard before he was removed from the cell. Payne testified that there was no blood on Howard when he removed him from the cell, and there was no blood inside the security box.

When they took Howard to the shower to be decontaminated, Howard refused to be decontaminated and requested to be assessed by the medical department, according to Payne. Payne said that Nurse Deel assessed him while standing at the bottom of the steps leading to the top tier of cells in the D building.

Payne testified that a security box brought to court August 8 was similar to the box used for pill pass that day at ROSP. The box shown to the court has five sides. Payne testified that the open side would go against the cell door covering the tray slot. The tray slot latch would then be released, letting the tray slot door fall open into the box. The box shown to the court was made of metal and was 18 inches to 2 feet wide, 18 inches to 2 feet high and about a foot deep. The top of the box contained a hinged lid with a large rectangular hole covered with clear plastic. The bottoms of screws were visible inside the lid of the box.

ROSP Warden Randall Mathena testified that he came in contact with Howard on November 7, 2011, after he had been removed from his cell. Mathena said that he spoke to Howard at the foot of the stairs leading to the top tier in the D building. Mathena said that Howard spoke to him about the metal and razor restriction in force in the D building at that time. He said that he saw no blood on Howard and that Howard voiced no allegations of being injured by the officers earlier in the day.

Mathena testified that, on November 7, 2011, he had been warden at ROSP less than 30 days. He stated that, at that time, ROSP procedure required officers to place a security box over the tray slot on any cell door before the tray slot was opened. At that time, according to Mathena, the officers placed the box against the cell door, and, if the inmate attempted to knock the box off, the officers held it in place. He stated that he later changed the policy to instruct the officers to release the box and move away from the cell. Mathena stated that the security boxes are now welded to the cell doors so that they cannot come off.

Lt. John McQueen, ROSP Investigator, stated that he reviewed the rapid eye video taken in Howard's pod on November 7, 2011. McQueen stated that the rapid eye video camera was located approximately 80 feet away from Howard's cell door. He stated that he did not save the video because all that could be seen were the backs of the officers at Howard's cell door.

ROSP Director of Nursing Vickie Phipps also testified at the August 8 hearing. Phipps stated that Howard's Department of Corrections medical file showed that he was an asthmatic and that he had suffered from eye problems due

to allergies since as early as 2008. Phipps stated that, from a medical perspective, having chronic asthma was not a contraindication for the use of pepper spray.

A video recording, which begins after Howard was pepper sprayed, was introduced into evidence previously in this case. When the video begins, Howard already has taken his hand out of the tray slot and is making threats towards the prison staff. The video shows that Howard continued to berate staff for some time before he complied with the command to place his hands in the tray slot in order to be restrained to be decontaminated and assessed by medical. From the video, it does not appear that Howard is in any pain or discomfort or is having any trouble breathing. In fact, it is clear that he has enough breath to continuously talk during most of the recording, including repeating numerous times phrases such as "I owe you" and "never forgive."

While placing Howard in restraints before removing him from his cell, the correctional officers also placed a spit mask over Howard's head. The officers then escorted Howard to the showers to be decontaminated. Once they arrived at the shower, the video shows that there is no discussion over the use of hot or cold water to decontaminate Howard. Rather, Howard stated that he did not want to be decontaminated and that he only needed someone with medical to look at his arm. The video does show Nurse Deel looking at Howard, but does not show whether any treatment was rendered.

The video does not show any blood on Howard's arms, clothing, cell or in the security box. The video does not show Howard's arms in enough detail to determine whether there were any wounds when he was removed from the cell.

*II. Analysis*

With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore, Ky.,* 93 F.3d 230, 233 (6th Cir. 1996).

The Eighth Amendment to the U.S. Constitution not only prohibits excessive sentences, but it also protects prison inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment

for a number of years. *See Hudson v. McMillian,* 503 U.S. 1, 5 (1992); *Whitley v. Albers,* 475 U.S. 312, 319 (1986). The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994*); Hudson v. Palmer,* 468 U.S. 517, 526-27 (1984).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams,* 77 F.3d at 761 (citing *Wilson v. Seiter,* 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson,* 503 U.S. at 9 (citing *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). To meet the objective component in an excessive force case, an inmate must show that the force used was "nontrivial," *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010), given that "contemporary standards of decency always are violated… whether or not significant injury is evident." *Hudson,* 503 U.S. at 9. "This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins,* 559 U.S. at 37 (quoting *Hudson,* 503 U.S. at 7). In fact, the extent of the injury may suggest that "'the use of force could plausibly have been thought necessary' in a particular situation" or "provide some indication of the amount of force applied." *Wilkins*, 559 U.S. at 37 (quoting *Hudson*, 503 U.S. at 7). For example, "[a]n inmate who complains of a [mere] 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins,* 559 U.S. at 37 (quoting *Johnson*, 481 F.2d at 1033). As *Wilkins* clarified, it is the nature of the force "that ultimately counts" and provides the "core judicial inquiry" in an excessive force case. 559 U.S. at 37, 38. In particular, courts must consider "whether [the force] was nontrivial and 'was

applied…maliciously and sadistically to cause harm.'" *Wilkins*, 559 U.S. at 39 (quoting *Hudson*, 503 U.S. at 7).

To meet the subjective component in an excessive force case, the inmate must show that the prison official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley,* 475 U.S. at 320-21. The inquiry under the subjective standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and sadistically. In particular, the court should consider:

1) The need for application of force;
2) The relationship between that need and the amount of force used;
3) The threat "reasonably perceived by the responsible officials," and
4) "any efforts made to temper the severity of a forceful response."

*Williams,* 77 F.3d at 762 (citing *Whitley,* 475 U.S. at 321).

Based on my review of the evidence previously filed with the court and the testimony and evidence presented at the August 8 hearing, I find that there is a genuine dispute of material fact that precludes the grant of summary judgment on Howard's excessive force claim regarding the alleged injury to his left arm and the initial use of pepper spray. However, I find that there is no genuine dispute of material fact with regard to his claim based on a failure to decontaminate him. Since this is the only claim raised against defendant Tate, I will recommend that summary judgment be granted in Tate's favor and that the court dismiss him as a

party defendant. Also, since there has been no evidence presented against Warden Mathena showing his involvement in any way with the use of force against Howard on November 7, 2011, I will recommend that summary judgment be granted in Mathena's favor and that he be dismissed as a party defendant.

Regarding the alleged injury to Howard's arm and the initial use of pepper spray against him, Howard's and the defendants' versions of events vary greatly. According to Howard, the defendants Fields and Whisenhunt pressed the security box down on his arm without any provocation in a deliberate attempt to injure him. Howard also has testified that Messer used pepper spray on him without any provocation or warning. The defendants deny Howard's claims and assert that their use of force was in an effort to control Howard's assaultive behavior. Also, the evidence is in dispute regarding the extent of any injury suffered. Unfortunately, the video evidence does not show what occurred prior to the use of pepper spray against Howard. While the video evidence does not show the amount of blood loss alleged by Howard, it does not confirm or deny that his left arm and wrist were injured. If a jury were to believe Howard's version of these events, both the subjective and the objective components of an excessive force claim would be met, allowing the jury to return a verdict in his favor. If a jury were to believe the defendants' versions of events, the jury could return a verdict in their favor. Therefore, the entry of summary judgment regarding this claim against defendants Fields, Whisenhunt and Messer is not appropriate.

The video evidence does conclusively show, however, that it was Howard who refused decontamination. On the video recording, Howard is asked if he wishes to go to the shower to decontaminate from the use of pepper spray, and

Howard answers that he does not. Only then is Howard returned to his cell. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where, as here, the record contains an unchallenged videotape capturing the events in question, the court must credit the plaintiff's version of the facts only to the extent it is not contradicted by the videotape. *See Scott,* 550 U.S. at 380; *Iko v. Shreve,* 535 F.3d 225, 230 (4th Cir. 2008). In this case, the videotape clearly contradicts Strickland's contention that he requested to be decontaminated, but with cold water as opposed to hot water. Instead, the videotape clearly evidences Strickland flatly refusing the offer to be decontaminated at all. Thus, the court will not credit Strickland's version of the facts on this claim, as the videotape clearly contradicts it. At the hearing, Howard conceded that his only claim against Tate was based on not allowing him to decontaminate. That being the case, there is no genuine dispute of material fact, and I recommend the court issue summary judgment in Tate's favor and dismiss him as a party defendant in this case.

### PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. There are genuine disputes of material fact with regard to Howard's excessive force claim against defendants Fields, Whisenhunt and Messer;

2. There are no genuine disputes of material fact with regard to Howard's excessive force claim against defendants Tate and Mathena;
3. The court should deny Howard's motions for summary judgment;
4. The court should deny the defendants' motions for summary judgment insofar as they seek judgment in favor of Fields, Whisenhunt and Messer on Howard's excessive force claim; and
5. The court should grant the defendants' motions for summary judgment and enter judgment in favor of defendants Tate and Mathena.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court deny Howard's motions for summary judgment, (Docket Item Nos. 104, 106), grant in part and deny in part defendants' motion for summary judgment, (Docket Item No. 60), and grant defendant Mathena's motion for summary judgment, (Docket Item No. 91).

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed

finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen E. Conrad, United States Chief District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

ENTERED: This 23rd day of August, 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE